UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES TURNER,

       Petitioner,

    v.

JOHN KATAVICH,

       Respondent.

Case No.   14-cv-3428-TEH

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; DENYING
CERTIFICATE OF APPEALABILITY

Charles Turner, a state prisoner, has filed this pro se petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. Respondent was ordered to show cause why the petition should not be granted. Respondent has filed an answer. For the reasons set forth below, the petition is DENIED.

I

On August 21, 2011, a Contra Costa County jury found Petitioner guilty of second degree murder of Lathel Douglas Sr. and attempted voluntary manslaughter of Lathel Douglas Jr. Clerk's Transcript ("CT") at 217-19. Petitioner was sentenced to 47 years to life in state prison. Id. at 540-46.

The California Court of Appeal affirmed the conviction. People v. Turner, No. A132790, 2013 WL 1641280 (Cal. Ct. App. April 17, 2013). The California Supreme Court denied review. Answer, Exs. 9, 10.

## II

The following factual background is taken from the order of the California Court of Appeal.[1]

### Prosecution's Case

**The Involved Parties**
Douglas Sr. lived at 1729 First Street in North Richmond. Douglas Jr. had lived in the house with his father and uncle, but moved out when his father got married. After moving out, Douglas Jr. continued to keep some clothing and personal effects at his father's house.

Douglas Jr. knew Quianna Moore from high school. The two were friends, but not romantically involved. Moore was a heavy drug user, and Douglas Jr. had both sold drugs to her and used drugs with her.

Douglas Jr. did not really know Vanessa Perez, but had seen her around the projects. Perez had lived in North Richmond for several years prior to the shooting. She had been living with her mother in an apartment in the public housing projects on West Ruby Street, until about five months before the shooting, when she moved in with a girlfriend on First Street. Perez met Turner, whom she knew as "Noony," in late 2008, when he visited a cousin who lived in the unit next door to Perez's mother. Perez met Moore through Turner. In September 2008, Turner and Moore had a child together.

**Douglas Jr.'s Testimony**
Douglas Jr. testified that, on November 6, 2009, he was driving past the West Ruby Street projects, where he saw Moore and Perez. Moore spotted Douglas Jr. and waved him over. Douglas Jr. needed gas money and asked Moore if she wanted to buy a $10 bag of marijuana. Moore agreed, but said she needed a ride to a nearby house to get the money. Moore got into the car, while Perez stayed behind.

---

[1] This summary is presumed correct. <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

United States District Court
Northern District of California

Moore directed Douglas Jr. to a house nearby on Warren Street, which was around the corner from Douglas Sr.'s home on First Street. She went inside to get the money while Douglas Jr. waited in the car. After a few minutes, Moore hurried out of the house and got into the car. She was agitated. She said, "he's comin'," and urgently told Douglas Jr. to "drive off."

As Douglas Jr. made a u-turn, he saw "[s]ome dude" he did not know approach. The man pointed a handgun at Douglas Jr. and told him to stop the car. Two other men were off to the side. The man with the gun walked around to the passenger side and told Moore to get out of the car. Moore refused. Douglas Jr. told Moore, "the dude got a gun. Open the door." When Moore still did not open the door, Douglas Jr. reached across Moore and opened her door. FN3.

> FN3. The passenger door of Douglas Jr.'s car was defective and required a special maneuver to open it.

Douglas Jr. asked what was going on. The man responded: "'It has nothing to do with you.'" Douglas Jr. tried to explain that he and Moore were not involved; as he put it, "[Moore was] actually trying to get high." This explanation made the armed man angrier. He began swearing at Moore, telling her she was not supposed to get high. He also said something like, "this is my kid." Moore still refused to get out of the car. After five minutes, the man said, "forget it," shut the car door, and walked off.

Douglas Jr. drove up the street a block, pulled over, and asked Moore to get out of the car because he did not want trouble. Moore responded that she still wanted to buy marijuana, and if he waited a few minutes, she would run back to the house to get $10. Douglas Jr. needed gas money in order to get to his son's birthday party and he reluctantly agreed. Moore returned a few minutes later with the cash, and Douglas Jr. gave her a small bag of marijuana. He then drove Moore back to the West Ruby Street projects.

There, they again met up with Perez. Perez joined them in the car. Douglas Jr. agreed to give Moore and Perez a ride to San Pablo

United States District Court
Northern District of California

since he was heading to Pinole.  Along the way, the three stopped by a gas station and smoked marijuana.  FN4.  Douglas Jr. then dropped the women off at Moore's friend's home in San Pablo.  Douglas Jr. went to his son's birthday party in Pinole.

> FN4.  Douglas Jr. was already high on methamphetamine at the time.

Later that evening, Moore called Douglas Jr. for a ride home.  He picked up the women, and they went to another house where they "got high some more."  Douglas Jr. commented that he needed to get his hair twisted again, and Moore offered to twist his braids for him.  Douglas Jr. drove the women to his father's home on First Street where he kept his hair products.

Douglas Jr. arrived at his father's house after 1:00 a.m., and backed his car into the driveway.  He called his father on his cell phone to let him in.  Douglas Jr. went inside the house for several minutes while the women waited in the car.  Perez was in the back seat and Moore was in the front passenger seat.  Douglas Jr. returned and put his hair products in the car.  As Douglas Jr. started to get in the driver's side of the car, he heard the sound of someone coming up behind him.  He looked up and saw "[s]ome dude in a hood" approaching with a gun in his hand.  A second man was standing nearby, about a car length away.

The armed man went around to the passenger side, opened the passenger door, and started arguing with Moore, telling her to get out.  Not wanting a commotion outside his father's house late at night, Douglas Jr. told Moore: "Get the fuck up off my car with this shit."  Immediately thereafter, the man raised the gun and shot Douglas Jr. in the neck.  FN5.  Douglas Jr. spun around and fell to the ground next to his car, where he played dead.  Both men came around to the driver's side and went through Douglas Jr.'s pockets, taking his wallet.  Douglas Jr. still had his cell phone in his hand.  He called his father and whispered into the phone that he had been shot.

> FN5.  On cross-examination, Douglas Jr. testified somewhat differently.  He said that, before the shooting, the armed man

4

asked Douglas Jr., "'What are you doing with this bitch?'" Douglas Jr. responded: "'What are you talking about?'" The man repeated his question, and before Douglas Jr. could respond, the man shot him.

Douglas Jr. did not see his father come outside. However, as Douglas Jr. was laying on the ground, he heard the gate open and heard Douglas Sr. say, "Hey little nigga." Then, Douglas Jr. saw the man who had shot him extend his right arm and heard the man fire three shots at Douglas Sr. He did not see the gun. Immediately after the three shots were fired, the armed man fled the scene.

Douglas Jr. ran across the street to his neighbor's house and frantically asked him to call an ambulance for his father. The police were dispatched to the scene at 1:25 a.m., and arrived within a few minutes. Douglas Jr. was taken, by ambulance, for treatment. Douglas Sr. suffered gunshot wounds to the chest and the foot and was pronounced dead at the scene.

At trial, Douglas Jr. denied knowing the shooter's identity and denied ever telling the police that Turner was the shooter. He also testified that the shooter was not the same person who confronted him and Moore with a gun on Warren Street. The two men had different body types and voices. They were also wearing different clothes. Douglas Jr. testified: "Code on the streets is don't tell, snitch. [¶] ... [¶] Could be the end of you, could be fatal." Douglas Jr. admitted that he had a criminal history, including convictions for possession of a stolen car and petty theft. He was on probation at the time of the shootings.

On cross-examination, however, Douglas Jr. was asked about his statements to police after the shooting. Douglas Jr. initially told police that he had been robbed by someone he did not know. After being released from the hospital, he repeated the same story. He was contacted by officers again on November 9 and November 10. On November 10, the police came to Douglas Jr.'s house and said, "you gotta come talk to us." Douglas Jr. explained that he didn't want to talk. The officer's asked Douglas Jr. if he

was on probation.  When he said "yes," the police said: "[T]ough luck.  You're going with us now."  At that point, Douglas Jr. "felt there was no options, really.... [He didn't] want to go to jail."  Douglas Jr. was taken to the Martinez police station, where the officers said nothing further about his probation.  At the station, Douglas Jr. finally mentioned he was with Perez and Moore.  Thereafter, the police "kept bothering" him.  Douglas Jr. continued to resist talking to police.  On November 16, Douglas Jr. again spoke with the police.

Perez's Testimony
Perez testified that, on November 6, 2009, Douglas Jr. drove by the West Ruby Street projects, where Moore and Perez were hanging out.  Moore and Perez walked over to his car. Moore got into the car, while Perez stayed behind.  Moore and Douglas Jr. returned 10 or 15 minutes later.  Douglas Jr. gave Moore and Perez a ride to San Pablo.  Along the way, the three stopped by a gas station and smoked methamphetamine.  Douglas Jr. then dropped the women off at Moore's friend's home, in San Pablo, where they watched television.

Later that evening, Douglas Jr. returned to pick up Moore and Perez.  According to Perez, he drove them straight back to North Richmond.  Douglas Jr. commented that he needed to get his hair twisted again, and Moore agreed to twist his braids for him. Douglas Jr. drove the women to his father's home on First Street where he kept his hair products.

Douglas Jr. arrived at his father's house and backed his car into the driveway.  Douglas Jr. went inside the house for several minutes while the women waited in the car.  Douglas Jr. returned with his hair products. However, unlike Douglas Jr., Perez testified that once back in the car, Douglas Jr. complained that he needed to fix the amplifier in his car to improve the sound quality.  Moore offered that she knew how to adjust the amplifier, and the two of them opened the trunk and worked for several minutes while Perez waited in the back seat.

When they finished, Moore returned to the passenger seat and Douglas Jr. headed for the driver's seat.  As Douglas Jr. started to get in the car, Perez saw Turner approaching.

Turner went to the passenger side of the vehicle and started arguing with Moore, telling her to get out. The passenger door was open, and at some point Moore began hugging Turner around the waist, saying, "[B]aby, it's okay. Stop." Douglas Jr. was standing between the car and the open driver's side door. Perez heard a gunshot and saw Douglas Jr. fall to the ground. Perez testified that she had seen a black handgun in Turner's left hand, which was pointed at the ground when Turner was arguing with Moore. FN6. Perez was asked: "If [Turner] was holding the gun, and he was pointing the gun over the hood of the car, would you have been able to see his hand or the gun from your vantage point?" She answered: "No."

FN6. At the preliminary hearing, Perez testified that Turner was holding the gun in his right hand.

After the shot was fired, Moore was already out of the car and the passenger door was closed. Turner looked at Perez and said, "'Vanessa, get out.'" Perez said she was "freaking out." She could not open the passenger door because it was broken, so she climbed out through the driver's door. When she got out of the car, Turner told her not to tell anyone. She promised she would not and started to run. She noticed a second man standing on the sidewalk, but she did not see him holding a gun. When Perez was around the corner, running toward the projects, she heard approximately four more shots fired. Moore ran in the opposite direction. Perez did not see anyone go through Douglas Jr.'s pockets.

A few days later Perez was picked up by police and spoke with them at the police station. From a photographic lineup, she identified Turner as the shooter. Since December of 2009, Perez had been receiving $800 per month for rent and $575 for incidentals from the district attorney's witness relocation program. She had been threatened by a man named "Dante." FN7.

FN7. The jury was instructed: "[T]here is no evidence linking [Turner] to the threat with regard to [Perez] ... and it is not evidence against [Turner] in this

case."

**Jeff Moule's Testimony**
Jeff Moule, then a homicide sergeant with the Contra Costa County Sheriff's Office, responded to the scene.  On November 7, Moule interviewed Douglas Jr. after he was released from the hospital.  Douglas Jr. told Moule that two unknown men ran up to him, said it was a robbery, shot him, and then fled on foot.  Douglas Jr. did not mention Perez or Moore.  Later on November 7, Moule received a tip about the identity of the shooter.  Moule prepared a photo lineup including Turner's picture and showed it to Douglas Jr. that evening.  Douglas Jr. claimed that the shooter was not in the lineup.  However, Moule observed that Douglas Jr. avoided looking at Turner's photograph.

On November 9, 2010, Moule again met with Douglas Jr., who said that he lied in his earlier statement because he feared for his safety and that of his family.  He told Moule that "[the police] were on the right track" and to keep doing what they were doing.  Moule asked Douglas Jr. to come to the station to give an interview the next day, but agreed to let Douglas Jr. discuss it with his family first.

The following day, Douglas Jr. initially balked at going to the station.  Moule then told Douglas Jr. that he was interfering with the investigation and "being on probation, that is not really a proper way to interact with law enforcement."  Moule told Douglas Jr.: "[H]e needed to come down, that [Moule] hadn't called his probation officer but ... could have done [so]."  At this point, Douglas Jr. agreed to be interviewed at police headquarters.  In the interview, Douglas Jr. finally mentioned he was with Perez and Moore, mentioned the incident on Warren Street, and gave a more detailed account of the shooting.  Douglas Jr. was clear that the same man with the gun on Warren Street was the shooter.  However, he still hesitated to identify the shooter, saying he was not comfortable doing so and needed to talk to his relatives.

On November 11, Moule interviewed Perez, who gave a full account of the evening and identified Turner as the shooter.  Turner turned himself in that same day. On November

14, Douglas Jr. called Moule and said that the shooter's photo had been in the bottom right corner of the photographic lineup. That photo was of Turner. On November 16th, Douglas Jr. came to the station on his own. He picked Turner out of a new photographic lineup and gave a taped statement identifying Turner as the shooter.  The prosecution played a video recording of Douglas Jr.'s November 16th taped interview.

**Physical Evidence**
Four shell casings were found at the scene. A fired projectile was also found in the front passenger floorboard area of Douglas Jr.'s car.  Bullet damage was found in the roof. Ballistics testing demonstrated that the four shell casings found at the scene were all fired by the same .40 caliber semiautomatic handgun.

Defense Case

**Rhashonda Stevenson's Testimony**
Turner's mother, Rhashonda Stevenson, testified that Turner is left-handed.  On November 11, 2009, Stevenson drove Turner to the police station, after learning that he was a murder suspect.  She also confirmed that Turner and Moore had a child together. The child was born in September 2008.

**Turner's Demonstration**
Turner did not testify.  However, he was directed by defense counsel to handwrite his name and the letters A through F on an easel in front of the jury.  The record reflects that he did so with his left hand.

**Verdict and Sentence**
In his closing argument, Turner's trial counsel argued that the prosecution's main witnesses, Douglas Jr. and Perez, were not credible.  He maintained that their testimony implicating Turner was not corroborated, as Turner was left-handed and there was no fingerprint or DNA evidence tying Turner to the scene.

The jury convicted Turner, on count one, of the lesser included offense of second degree murder and, on count two, the lesser included offense of attempted voluntary manslaughter. The jury also found the firearm enhancements to be true as to both counts.  The jury found Turner not guilty of robbery, but hung on the

9

United States District Court
Northern District of California

> lesser included offenses for that charge, and the court declared a mistrial as to the lesser charges. Turner was sentenced to a term of 47 years to life in state prison and the prosecution dismissed the remaining charges. Turner filed a timely notice of appeal.

Turner, 2013 WL 1641280, at *1-5.

### III

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may

grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 562 U.S. 594, 598 (2011).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme

Court] is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17 (2003).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the state's highest court, the court "looks through" to the last reasoned opinion.  <u>See</u> <u>Ylst</u>, 501 U.S. at 804.

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.  Petitioner alleges that: 1) the trial court erred in admitting statements to police made by the victim, Douglas Jr.; and 2) the trial court erred in instructing the jury that they could consider other offenses to establish Petitioner's identity.

IV

A

Petitioner first contends that statements made by victim Douglas Jr. between November 10 and November 16 were the result of police coercion and therefore improperly admitted at trial. Petitioner argues that police sergeant Moule's reference to Douglas Jr.'s probation status rendered his later statements involuntary and they should have been excluded.

The California Court of Appeal set forth the background for this claim:

> In the middle of Moule's testimony, outside the presence of the jury, Turner's trial counsel moved to exclude any statements

12

United States District Court
Northern District of California

Douglas Jr. made to police after November 10, 2009, on the ground that the statements were coerced. Specifically, Turner's trial counsel argued: "[I]t is my position those statements over the next five-day period—it's not a long period, less than a week—were coerced statements, not in the sense of a gun to the gentleman's head, but in the sense he had no choice, given the prospect of incarceration, and it would be a violation of due process to admit those statements from that point forward...."

A hearing was held pursuant to Evidence Code section 402, in which Moule was examined by the People and defense counsel. Moule testified: "[On November 10,] I [told Douglas Jr.] the problem is ... yesterday, you told us that you lied to us, you know. This is a homicide. It's a serious investigation. You're on probation. I think you need to come down with us. You know, you admitted to interfering with our investigation. We're heading in a direction and then you lied to us. You told us nope, that's not it. [¶] So now we're looking around some more. We're using resources, ... but then you admit no, that was a lie. You're on the right track. We're at a standstill waiting on your truthful statement regarding what happened here. [¶] Will you please come with us and talk with us ... ? [¶] ... [¶] I don't recall I ever said ... you're going to be under arrest or going to jail or anything like that. You know, I made mention of probation, calling his probation officer. I said I had not yet. Made mention that he was interfering, and ... by admitting that he lied to us and we're on the right track, he was confusing our investigation, and we needed to get the truth out so we can move forward. That was the extent." When Douglas Jr. did speak to Moule, later that day, he discussed the involvement of Moore and Perez, the Warren Street incident, and also said that the same man later shot him and his father. However, Douglas Jr. continued to refuse to identify the shooter by name.

Between November 10 and November 14, Moule repeatedly called and left messages for Douglas Jr. On November 14, 2009, Douglas Jr. called Moule on the phone and said he "want[ed] to come clean." Douglas Jr. identified the shooter's location in the photographic lineup he had previously been

United States District Court
Northern District of California

shown.     No   mention   of   probation   or
interference with an investigation came up
during that conversation.   On November 16,
2009, Douglas Jr. showed up at the police
station on his own.   Moule showed Douglas Jr.
a second photo lineup and recorded a short
interview.   During that interview, Douglas
Jr.   identified   Turner   as   the   shooter.
Douglas Jr.'s car and cell phone were
returned to him that same day.   Douglas Jr.
was never handcuffed.

After   hearing   argument,   the   trial   court
concluded that the police conduct did not
rise to the level of coercion.   The trial
court explained: "First of all, naturally
they were calling him because he was a victim
and percipient witness, so I don't find that
coercion.   They gave him a lot of opportunity
to come forward.   While ... Moule mentioned
that the probation, and certainly one could
say there's an implicit threat in that.   I
don't find that he threatened him in any way
that caused [Douglas Jr.] to come forward.
[¶] I think [Douglas Jr.] came forward on his
own volition, and I think that's particularly
highlighted by the fact that on November 14,
[Douglas Jr.] calls ... and comes in [on
November 16,] voluntarily.   He comes in on
his own.   He isn't even picked up and brought
in by law enforcement then....   And there was
a lapse of time between the first interview
on the 10th and when he ultimately called ...
on   the   14th   of   November.   [¶] So I'm not
finding that he was coerced or threatened,
and I do agree that if you do mention the
probation officer, there could be an implicit
threat   there,   but   he   just   mentioned   'I
haven't called the probation officer.'   He
hasn't gone on in great detail ... about what
could   happen   ...   if   I   called   probation
officer.   [¶] And I do find ... Moule very
credible."   Turner's motion was denied.

Turner, 2013 WL 1641280, at *6-7.   The California Court of Appeal

then denied this claim:

Turner   contends   that   Moule's   reference   to
Douglas Jr.'s probation officer made the
statements coerced.   A witness's statement is
coerced   if   it   is   the   product   of   police
conduct which overcomes the individual's free
will.   (People v. Lee (2002) 95 Cal. App. 4th

14

772, 782 (Lee).)  A statement is considered involuntary if not "'"the product of a rational intellect and a free will."'" (Mincey v. Arizona (1978) 437 U.S. 385, 398.) Voluntariness is tested by the totality of the circumstances, including the details of the interrogation and the characteristics of the witness.  (People v. Hill (1992) 3 Cal. 4th 959, 981, disapproved on other grounds by Price v. Superior Court (2001) 25 Cal. 4th 1046, 1069, fn. 13; Schneckloth v. Bustamonte (1973) 412 U.S. 218, 226.)

. . .

Contrary to Turner's suggestion, this case is nothing like Lee, supra, 95 Cal. App. 4th 772.  Moule did not lie to Douglas Jr., threaten to call his probation officer unless he implicated Turner, nor did Moule ever suggest any particular statement police wanted Douglas Jr. to give.  There is no evidence that, before Douglas Jr. implicated him, Turner's name was even mentioned by Moule.  To the extent Moule pressured Douglas Jr., it was only to tell the truth.  Such pressure is permissible.  (See People v. Boyer, supra, 38 Cal. 4th at p. 445; People v. Jenkins, supra, 22 Cal. 4th at p. 1010; People v. Hill, supra, 66 Cal. 2d at p. 549.) Even immediately after being subject to Moule's pressure, on November 10, Douglas Jr. continued to refuse to name the shooter.  It was only days later, after Turner had turned himself in, that Douglas Jr. himself initiated statements to police that implicated Turner.  The evidence in fact indicates that any "coercion" Douglas Jr. felt was not from police conduct, but from his concern not to be identified as a "snitch" who voluntarily provided information to police.  We conclude that Turner has not met his burden, under the totality of the circumstances, to show that Douglas Jr.'s statements, made after November 10, 2009, were tainted by improper coercion.

Turner, 2013 WL 1641280, at *7 (footnote omitted).

Although the United States Supreme Court has clearly established both that the admission of a defendant's involuntary statements violates the Constitution (Blackburn v. Alabama, 361

U.S. 199, 205 (1960)), and that the prosecution's knowing use of the false testimony/statements of a witness, including false testimony/statements extorted through violence, violates the Constitution (<u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)), the Supreme Court has not established that the admission of a witness's involuntary statements which the prosecutor does not know to be false constitutes a violation of the Due Process Clause.  <u>See</u> <u>Samuel v. Frank</u>, 525 F.3d 566, 569 (7th Cir. 2008) (discussing absence of Supreme Court authority); <u>Spencer v. Biter</u>, 2012 WL 8023845, *13 (C.D. Cal. Nov. 21, 2012) (noting Supreme Court has never held that accused can challenge admission of a witness's coerced statement), <u>report and recommendation adopted</u>, 2013 WL 1970244 (C.D. Cal. May 9, 2013); <u>Horton v. McWean</u>, 2012 WL 6110488, *11 (C.D. Cal. Nov.5, 2012) ("The Supreme Court has not yet addressed whether the admission of coerced testimony of a third party at a criminal trial violates the Due Process Clause regardless of falsity."), <u>report and recommendation adopted</u>, 2012 WL 6131200 (C.D. Cal. Dec. 10, 2012).

Although the Supreme Court has not done so, the Ninth Circuit has held that a criminal defendant is entitled to habeas relief if the admission of coerced third party testimony rendered his trial so fundamentally unfair as to violate due process. <u>Williams v. Woodford</u>, 384 F.3d 567, 593 (9th Cir. 2004).

In the absence of clearly established Supreme Court authority, the California Court of Appeal's rejection of Petitioner's claim cannot be contrary to, or involve an unreasonable application of, clearly established Supreme Court

law; therefore, Petitioner is not entitled to relief.  <u>See</u>
<u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009) (it is not an
unreasonable application of clearly established federal law for
state court to decline to apply specific legal rule that has not
been squarely established by Supreme Court).  There are no
allegations and no indication that Douglas Jr.'s testimony was
false to support a claim under <u>Napue</u>.  The state court discussed
the statements by Douglas Jr. and the circumstances surrounding
them and did not find them coerced or false.  The police sergeant
did not threaten to contact Douglas Jr.'s probation officer,
Douglas Jr. was never handcuffed or detained, and he voluntarily
came to the police station.  Petitioner has failed to demonstrate
an unreasonable application of Supreme Court authority or an
unreasonable determination of the facts.

Nor has petitioner shown that the admission of the testimony
rendered his trial so fundamentally unfair as to violate due
process.  There are no allegations that Petitioner was coerced
into identifying Petitioner, only that he was coerced into
cooperating.  Assuming arguendo that Douglas Jr.'s testimony
identifying Petitioner was coerced, there was another eyewitness
who identified Petitioner as the shooter providing evidence of
his guilt.  Therefore, the trial was not rendered fundamentally
unfair by Douglas Jr.'s testimony.  This claim is denied.

B

Petitioner next argues that the trial court erred by issuing
a jury instruction that the jury could consider evidence of the
Warren Street incident as relevant to the identity of the shooter
pursuant to a modified version of CALCRIM 375.  The jury was

United States District Court
Northern District of California

1   instructed that:

3   > The People presented evidence that the
    > defendant committed another offense of
    > brandishing a weapon in violation of ...
    > section 417 that was not charged in this
    > case; [¶] AND [¶] The People presented
    > evidence that the defendant had an
    > altercation with [Moore] and [Douglas Jr.] on
    > Warren Street before the shooting. [¶] You
    > may consider this evidence only if the People
    > have proved by a preponderance of the
    > evidence that the defendant committed the
    > uncharged offense and/or had the altercation.
    > Proof by a preponderance of the evidence is a
    > different burden of proof than beyond a
    > reasonable doubt. A fact is proved by a
    > preponderance of the evidence if you conclude
    > that it is more likely than not that the fact
    > is true. [¶] If the People have not met this
    > burden, you must disregard this evidence
    > entirely. [¶] If you decide that the
    > defendant committed the uncharged offense or
    > act you may, but are not required to,
    > consider that evidence for the limited
    > purpose of deciding whether or not: [¶] The
    > defendant was the person who committed the
    > offenses alleged in this case; or [¶] The
    > defendant acted with the intent to rob
    > [Douglas Jr.], kill [Douglas Jr.] or kill
    > [Douglas Sr.]; or [¶] The defendant had a
    > motive to commit the offenses alleged in this
    > case. [¶] Do not consider this evidence for
    > any other purpose except for the limited
    > purposes of identity, intent and/or motive.
    > [¶] Do not conclude from this evidence that
    > the defendant has a bad character or is
    > disposed to commit crime. [¶] If you conclude
    > that the defendant committed the uncharged
    > offense and/or act, that conclusion is only
    > one factor to consider along with all the
    > other evidence. It is not sufficient by
    > itself to prove that the defendant is guilty
    > of murder, attempted murder, or robbery. The
    > People must still prove each charge and
    > allegation beyond a reasonable doubt.

25  Reporter's Transcript ("RT") at 1171-72; CT at 286.

26      However, the California Court of Appeal discussed this claim

27  in detail and noted that it was Petitioner who requested this

28  instruction and it was his modified version of the jury

instruction that was issued.  <u>Turner</u>, 2013 WL 1641280, at *8-10.
The state court then denied the claim under the invited error
doctrine:

> We agree with the People that the doctrine of
> invited error bars Turner from raising his
> current complaint.  "The doctrine of invited
> error bars a defendant from challenging an
> instruction when the defendant has made a
> conscious and deliberate tactical choice to
> request it. [Citations.]" (<u>People v. Enraca</u>
> (2012) 53 Cal. 4th 735, 761; <u>People v. Harris</u>
> (2008) 43 Cal. 4th 1269, 1292-1294.)  "'The
> doctrine of invited error is designed to
> prevent an accused from gaining a reversal on
> appeal because of an error made by the trial
> court at his behest.  If defense counsel
> intentionally caused the trial court to err,
> the appellant cannot be heard to complain on
> appeal....  [I]t also must be clear that
> counsel acted for tactical reasons and not
> out of ignorance or mistake.'  In cases
> involving an action affirmatively taken by
> defense counsel, we have found a clearly
> implied tactical purpose to be sufficient to
> invoke the invited error rule.  [Citations.]"
> (<u>People v. Coffman and Marlow</u> (2004) 34 Cal.
> 4th 1, 49; <u>see also People v. Wader</u> (1993) 5
> Cal. 4th 610, 657-658.)  If the record shows
> no tactical decision, the invited error
> doctrine is not applied.  (<u>People v. Harris</u>,
> <u>supra</u>, 43 Cal. 4th at p. 1299.)
>
> Here, as the above excerpts from the record
> make clear, Turner's trial counsel did not
> merely acquiesce.  In fact, he affirmatively
> requested CALCRIM No. 375 and affirmatively
> sought the modified language that was
> ultimately presented to the jury.  We can
> infer that Turner sought a tactical advantage
> in doing so.  Namely, he sought to add to the
> prosecution's burden of proof with respect to
> the Warren Street incident.  Thus, Turner
> cannot be heard to challenge the instruction
> on appeal.

<u>Turner</u>, 2013 WL 1641280, at *10.

The invited error doctrine is recognized as a valid
procedural default that bars federal habeas review.  <u>See</u>, <u>e.g.</u>,

United States District Court
Northern District of California

1   <u>Leavitt v. Arave</u>, 383 F.3d 809, 832 (9th Cir. 2004) (recognizing

2   that invited error doctrine may be a valid basis for procedural

3   default under habeas review where the state court clearly and

4   expressly invoked the invited error doctrine).  In this case,

5   Petitioner not only failed to object to the jury instruction, but

6   in fact requested it.  Because the trial court issued

7   Petitioner's requested jury instruction, he is not now entitled

8   to claim that the issuance of the instruction was an error.

9        A petitioner may show cause for a procedural default by

10   establishing constitutionally ineffective assistance of counsel,

11   but attorney error short of constitutionally ineffective

12   assistance of counsel does not constitute cause and will not

13   excuse a procedural default.  <u>See</u> <u>McCleskey v. Zant</u>, 499 U.S.

14   467, 494 (1991).  Petitioner has failed to demonstrate that his

15   counsel's performance was constitutionally ineffective and has,

16   therefore, not shown cause for the procedural default.

17        Regardless, even looking to the merits of the claim,

18   Petitioner is not entitled to relief.  A challenge to a jury

19   instruction solely as an error under state law does not state a

20   claim cognizable in federal habeas corpus proceedings.  <u>See</u>

21   <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).

22        To obtain federal collateral relief for errors in the jury

23   charge, a petitioner must show that the ailing instruction by

24   itself so infected the entire trial that the resulting conviction

25   violates due process.  <u>See</u> <u>Estelle</u> at 72; <u>Cupp v. Naughten</u>, 414

26   U.S. 141, 147 (1973).  The instruction may not be judged in

27   artificial isolation, but must be considered in the context of

28   the instructions as a whole and the trial record.  <u>See</u> <u>Estelle</u> at

72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)).

Petitioner argues that the jury instruction permitted the jury to consider the Warren Street incident to identify him as the shooter, instead of only using the incident to demonstrate motive.  He argues it lowered the prosecution's burden of proof.  However, the jury instruction was clear that the evidence was only to be used in deciding identity and the prosecution must still prove each charge beyond a reasonable doubt.  The jury was also separately properly instructed that Petitioner was entitled to an acquittal unless the evidence demonstrated he was guilty beyond a reasonable doubt.  CT at 263.

Petitioner has failed to show that this one instruction by itself so infected the entire trial that the resulting conviction violated due process.  As discussed in the prior claim, Douglas Jr. identified Petitioner.  Another witness also identified Petitioner as the shooter.  RT at 180-81, 213-21, 238-39, 297.  For all these reasons, this claim is denied.

V

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's

United States District Court
Northern District of California

assessment of the constitutional claims debatable or wrong."
Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not
appeal the denial of a Certificate of Appealability in this Court
but may seek a certificate from the Court of Appeals for the
Ninth Circuit under Rule 22 of the Federal Rules of Appellate
Procedure.  See Rule 11(a) of the Rules Governing Section 2254
Cases.

The Clerk is directed to enter Judgment in favor of
Respondent and against Petitioner, terminate any pending motions
as moot and close the file.

IT IS SO ORDERED.

Dated: 11/02/2015

THELTON E. HENDERSON
United States District Judge

G:\PRO-SE\TEH\HC.14\Turner3428.hc.docx